IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. |
| v. | VIOLATION: |
| AHMAD HARIS TAJYAR | 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) |
| Defendant. | |

**STATEMENT OF THE OFFENSE**

Pursuant to Federal Rule of Criminal Procedure 11, the United States, by and through its undersigned attorneys, and AHMAD HARIS TAJYAR, with the concurrence of his attorney, Stuart Berman, stipulate and agree that the following facts fairly and accurately describe TAJYAR'S conduct in the offense to which he is pleading guilty. These facts do not constitute all of the facts known to the parties concerning the charged offense and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that TAJYAR committed the offense to which he is pleading guilty. TAJYAR knowingly, voluntarily, and truthfully admits to the facts set forth below.

*Background*

1. The defendant, AHMAD HARIS TAJYAR, was a resident of California.

2. TAJYAR was the Managing Partner and sole owner of Bright Light Marketing Inc. d/b/a Investor Relations Partners. Investor Relations Partners was an investor relations and corporate communications firm founded by TAJYAR in and around 2015.

3. Minerco, Inc. traded under the stock symbol MINE in the Over-the-Counter Markets ("OTC"). Stocks commonly known as "penny stocks" are often traded on OTC Markets,

4. Co-Conspirator-1 ("CC-1") controlled all aspects of Minerco from in or around

1

October 2019 until at least in or around June 2021.

5.      Co-Conspirator-2 ("CC-2") served as the publicly identified CEO of Minerco from in or around October 2019 until at least in or around June 2021. CC-1 asked CC-2 to be the CEO of Minerco.

6.      At the request of CC-1, TAJYAR provided investor relations services to Minerco.

### *TAJYAR'S Criminal and Regulatory History*

7.      On June 4, 2009, the Securities and Exchange Commission ("SEC") filed a civil action against TAJYAR, alleging that in connection with an insider trading scheme TAJYAR realized illegal trading profits of about $924,000. *SEC v. Tajyar*, 09-CV-3988 (C.D. Cal.). TAJYAR settled the case, and the court permanently enjoined TAJYAR from, among other things "employ[ing] any device, scheme, or artifice to defraud" or "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" "in connection with the purchase or sale of any security[.]" *Id.* at ECF 96 (July 19, 2013).

8.      On or about March 30, 2010, TAJYAR was indicted on two counts of conspiracy to commit securities fraud and thirteen counts of securities fraud in connection with two insider trading conspiracies. *See United States. v. Tajyar*, Case 10-CR-313 (C.D. Cal.). TAJYAR pleaded guilty to two counts of conspiracy to commit securities fraud and received a 40-month sentence of imprisonment on or about November 30, 2012.

9.      On or about August 13, 2021, the SEC filed another civil action against TAJYAR, alleging that TAJYAR engaged in manipulative trading and a false promotional scheme. *SEC v. Tajyar*, 21-CV-6557 (Aug, 13, 2021 C.D. Cal.). TAJYAR settled the case, and the court permanently enjoined Tajyar from, among other things "employ[ing] any device, scheme, or

2

artifice to defraud" or "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" "in connection with the purchase or sale of any security[.]" *Id.* at ECF 13. The court also ordered TAJYAR to pay a civil penalty of $219,604.00. *Id.*

### *Overview of the Minerco Scheme and Conspiracy*

10. As more fully described below, from in or around November 2019 through in or around June 2021, TAJYAR did knowingly and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, and agree with CC-1, CC-2, and others, to commit: wire fraud, that is, to knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1349.

11. TAJYAR conspired with CC-1, CC-2, and others to defraud investors of the publicly traded stock in Minerco. Among other things, TAJYAR conspired with CC-1 and CC-2 to issue press releases about Minerco, at least some of which contained materially false and misleading information in an effort to make Minerco appear as a legitimate company and increase the share price of Minerco stock; conspired with CC-1 and CC-2 to conceal CC-1's involvement with Minerco to the public given CC-1's past criminal fraud convictions and multiple negative news stories about CC-1; and conspired with CC-1 to conceal TAJYAR's work for Minerco given

TAJYAR's past criminal conviction and regulatory history.

### *Concealment of CC-1's Role at Minerco*

12. At some point while doing work for Minerco, TAJYAR became aware that CC-1 had misdemeanor convictions related to a mortgage fraud scheme. TAJYAR also knew that there were multiple negative news articles about CC-1 on the internet, such as a March 18, 2018 article titled: "Judge calls businessman [CC-1] a criminal" and an article from December 28, 2018 titled: "$252K taken at airport is latest scandal for Southfield businessman" that stated: "[CC-1], a Southfield businessman, is embroiled in a federal forfeiture case in Charlotte, North Carolina.

13. TAJYAR also knew that although CC-2 was identified publicly as the CEO of Minerco, that CC-1, in fact, controlled Minerco and ran its day-to-day operations. For example, CC-1 made corporate strategy decisions on behalf of Minerco, CC-1 engaged in negotiations with third parties on behalf of Minerco, CC-1 paid or directed others to pay monies on behalf of Minerco, CC-1 directed others to draft press releases for Minerco. As it related to Minerco, CC-2 acted at the direction of CC-1, and CC-2 was subordinate to CC-1.

14. TAJYAR knew that CC-1 had installed CC-2 as the publicly identified CEO of Minerco because CC-1 did not want the public to know that CC-1 was involved with Minerco, and that CC-1 controlled Minerco and ran its day-to-day operations.

15. TAJYAR conspired with CC-1 and CC-2 to conceal from the public CC-1's involvement with Minerco and to provide the public with the false impression that CC-2 oversaw Minerco's operations by among other things, causing press releases to be issued that identified CC-2 as the CEO of Minerco, but that never disclosed CC-1's involvement with Minerco.

### *The "Bill Miller" Alias*

16. The negative publicity that resulted from TAJYAR's criminal conviction and the

SEC's lawsuits and related settlements made it difficult for TAJYAR to do investor relations work using his own name. TAJYAR therefore sometimes used the alias "Bill Miller" to conceal his true identity and mislead the public and various stock-related businesses and individuals.

17. TAJYAR, among other things, used the "Bill Miller" alias to promote Minerco and to communicate with prospective and actual Minerco investors. For example:

18. On or about March 3, 2021, TAJYAR caused a false and misleading press release to be issued announcing that Minerco had hired Investor Relations Partners "to provide investor relations and capital markets advisory services to the Company." The press release included a quote attributed to "Bill Miller of Investor Relations Partners" that stated:

> Bill Miller of Investor Relations Partners, said, "We are looking forward to introducing Minerco's investment story beyond its existing shareholders as we look to increase and diversify its ownership structure. We expect Minerco will appeal to both value and earnings growth retail and institutional investors given our belief the company is undervalued when considering the pent-up and growing demand for the company's unique and proprietary psilocybin mushroom products, or more commonly referred to as a "Magic Mushrooms". The company's position at the forefront of the movement to legalize psilocybin should enable Minerco to generate significant revenue growth and profitability as it continues to successfully execute on its business plan," concluded Mr. Miller.

19. The press release further stated "For Further Information" to contact "Bill Miller[,] Investor Relations Partners[,] bmiller@irpartnersinc.com.

20. At least as early as 2017, TAJYAR created the email address bmiller@irpartnersinc.com. TAJYAR used this email address to receive emails from actual and potential Minerco investors and to send false and misleading emails to actual and potential Minerco investors, and others. For example:

a. On or about March 8, 2021, in response to an email from someone identifying themselves as a Minerco investor, TAJYAR used the bmiller@irpartnersinc.com email

address to send an email that stated: "I've been in the investor relations field and in corporate finance for the past 30+ years. I have been with Harry Tajyar, the majority owner of Investor Relations firm, almost from the first couple of months of launching the firm . . . We have never and will never represent a company that has a questionable business . . . Sincerely, Bill Miller."

b. On or about March 11, 2021, in response to an email from another individual asking about Minerco, TAJYAR used the bmiller@irpartnersinc.com email address to state: "As far as the scam or fraudulent rumors go, I can tell you unequivocally that IRP is not a fraud since we have represented multinational firms, have won numerous industry awards and would be willing to meet any shareholder, anytime and any place . . . Thanks, Bill Miller[.]"

c. On or about March 28, 2021, TAJYAR, using the bmiller@irpartnersinc.com email address, emailed a website that had compiled a list of psilocybin-related stocks: "I am reaching out on behalf of our client Minerco, Inc. (OTC: MINE), a psilocybin company that last week announced it will be expecting revenues ahead of schedule . . . We were wondering if your editors could take another look at this company to determine if it could be added to your comprehensive list of other companies in the same space. If you would like to have an interview with management or have any questions, please feel free to call us at 323-[xxx-xxxx]. Thank you, Bill Miller." TAJYAR then forwarded the email to CC-2 and wrote: "I just sent this out[.]"

21. To make it appear that "Bill Miller" was a real person, TAJYAR created a LinkedIn profile in the name of "William Miller" and listed him as holding the position of Partner at Investor Relations Partners from April 2015 to present. Because "Bill Miller" did not exist, TAJYAR used

a photo of another person in the LinkedIn profile.

22. In and around March 2018, TAJYAR created a Twitter account in the name of "Bill Miller" that falsely stated "Bill Miller" has "Over 30 years of Wall Street experience, including senior level positions as a sell-side analyst, a 13F fund manager and a small-cap financier." Because "Bill Miller" did not exist, TAJYAR used a photo of another person in the Twitter profile.

23. TAJYAR used the "Bill Miller" alias to promote stocks other than Minerco at least as far back as 2017 and continuing through at least June 2021, including for a pharmaceutical company on or about September 6, 2017; a company in the cannabis industry on or about June 19, 2018; another company in the cannabis industry on or about December 7, 2018; and a company in the hemp industry on or about June 8, 2021.

24. CC-1 knew that TAJYAR used the "Bill Miller" alias to conceal his true identity because TAJYAR had a previous criminal conviction and other negative regulatory history.

### *Other False and Misleading Statements and Conduct*

25. TAJYAR also conspired with CC-1 and CC-2 to issue false and misleading press releases regarding Minerco and to make false and misleading statements to investors on video conference calls. For press releases, CC-1 generally contacted TAJYAR with an idea for a press release, TAJYAR then wrote the press release or hired others to write the press release, and generally sent it back to CC-1 for approval, and then CC-2 provided approval. For example:

   a. On or about January 16, 2020, TAJYAR caused a press releases to be issued that misleadingly identified CC-2 as the CEO of Minerco.

   b. On or about March 26, 2021, TAJYAR caused a press release to be issued that falsely stated Minerco is "on track for revenue generation for April 2021."

   c. On or about March 28, 2021, during a video conference call with Minerco investors,

TAJYAR falsely stated: "Our staff is growing from 3 to over 25 in the last 3 months."

d. On or about April 19, 2021, TAJYAR caused a press release to be issued regarding a concert to be hosted by Minerco, that falsely stated Minerco "believes a minimum of one million tickets will be sold . . . which is expected to result in record financial contributions to Minerco's bottom-line both for the second fiscal quarter and current fiscal year ended December 31, 2021."

e. On or about March 15, 2021, CC-2 emailed TAJYAR, "I would like to introduce you to the addition to our team, [CC-1]. [CC-1] has been added to Minerco as a Consultant to help with business development and in particular to help me with capital markets, including investor relations. Considering the time difference between the states and where i typically reside, it would make more sense for you to coordinate our IR program through [CC-1] versus having to work with me on a daily basis." TAJYAR replied: "Thank you for the update and I have to commend you on the move considering how many CEOs do not spend enough time communicating with their shareholders." TAJYAR responded in this manner to create the false impression that CC-1 had only recently become involved with Minerco.

26. Between on or about March 22, 2021 and March 29, 2021, TAJYAR bought 190,000 Minerco shares for approximately $1,291 using a brokerage account in the name of Individual-1, who was Tajyar's then-girlfriend. TAJYAR used the brokerage account in Individual-1's name because TAJYAR could not open brokerage accounts in his own name. Although TAJYAR intended to profit by trading Minerco stock, he sold the 190,000 Minerco shares for approximately $1,051 and incurred a loss.

27. On or about May 26, 2021, TAJYAR learned that the SEC suspended trading in

Minerco stock. The Order suspended trading in Minerco between May 27, 2021, and June 10, 2021.

28. CC-1 paid TAJYAR at least $28,250 between in or around December 2019 and April 2021, at least in part, to do investor relations work for Minerco into Bank of America Account x3765 in the name of Bright Light Marketing, LLC as follows:

| Date | Amount |
|---|---|
| 12/10/2019 | $1,000 |
| 1/10/2020 | $1,000 |
| 1/31/2020 | $2,000 |
| 2/20/20 | $1,250 |
| 3/1/2021 | $6,000 |
| 3/9/2021 | $7,000 |
| 4/6/2021 | $10,000 |
| Total | $28,250.00 |

29. The above-described facts establish that TAJYAR violated a prior judicial order, including a July 19, 2013 order in *SEC v. Tajyar*, 09-CV-3988 (C.D. Cal.) that permanently enjoined TAJYAR from, among other things "employ[ing] any device, scheme, or artifice to defraud" or "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" "in connection with the purchase or sale of any security[.]"

### The Loss Amount

30. As a result of the conspiracy to defraud Minerco investors, TAJYAR, CC-1, and CC-2 artificially increased the share price of, and demand for, Minerco stock. Further, thousands of investor victims purchased Minerco stock at artificially inflated prices and incurred losses.

31. By calculating the difference between the average price of Minerco stock during the period that the fraud occurred (January 16, 2020 to May 25, 2021) and the average price of Minerco stock during the 90-day period after the fraud was disclosed to the market (June 11, 2021

to September 9, 2021), and multiplying the difference in average price by the number of shares outstanding (13,013,090,995 shares), the total loss attributable to the conspiracy is approximately $47,723,274.64 based on the following calculation.

|  | Date Range | Avg. Minerco Price | Difference b/w Avg. Prices |
|---|---|---|---|
| **Period of the Fraud** | January 16, 2020 to May 25, 2021 | $0.0042870108 | - |
| **90 Days Following Fraud** | June 11, 2021 to September 9, 2021 | $0.0006196826 | - |
| - | - | - | $0.0036673281 |
| **Loss Amount** | $0.0036673281 (Difference in Avg. Price) * 13,013,090,995 (Shares Outstanding) = $47,723,274.64 | | |

## DEFENDANT'S ACCEPTANCE

I have read the foregoing Statement of Offense, and I have discussed it fully with my attorney, Stuart Berman. I fully understand this proffer and I acknowledge its truthfulness, agree to it, and accept it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this proffer fully.

Date: 9/27/24

_____
Ahmad Haris Tajyar
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read every page constituting the government's statement of offense related to my client's guilty plea. I have reviewed the entire proffer with my client, Ahmad Haris Tajyar, and have discussed it with him fully. I concur in my client's agreement with and acceptance of this proffer.

Date: 9/27/24

_____
Stuart Berman
Attorney for Defendant